JUDGE CASTEL

13 CIV 5243

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANACO INTERNATIONAL FORWARDERS, INC., individually and on behalf of others similarly situated,

       Plaintiff,

    -against-

NIPPON YUSEN KABUSHIKI KAISHA, NYK LINE (NORTH AMERICA) INC., MITSUI O.S.K. LINES, LTD., KAWASAKI KISEN KAISHA LTD., "K" LINE AMERICA, INC., EUKOR VEHICLE CARRIERS INC., WALLENIUS WILHELMSEN LOGISTICS ASA, WALLENIUS WILLHELMSEN LOGISTICS AMERICAS LLC, WALLENIUS LINES AB, WILH. WILHELMSEN HOLDING ASA, WILH. WILHELMSEN ASA, COMPANIA SUD AMERICANA DE VAPORES S.A., TOYOFUJI SHIPPING CO., LTD., and NISSAN MOTOR CAR CARRIER CO., LTD.,

       Defendants.

---

Case No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED



RECEIVED JUL 2 6 2013 U.S.D.C. S.D.N.Y. CASHIERS

---

   Plaintiff Manaco International Forwarders, Inc. ("Manaco" or Plaintiff"), by its undersigned attorneys, individually and on behalf of all others similarly situated, brings this action under the federal antitrust laws to recover treble damages, injunctive relief, and the costs of suit, including reasonable attorneys' fees, for their injuries and those of the members of the proposed Class (as defined below) resulting from Defendants' violations of the federal antitrust laws, specifically Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and demands a trial by jury. The allegations set forth below are based upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.      Defendants Nippon Yusen Kabushiki Kaisha ("NYK Line"), NYK Line (North America) Inc. ("NYK America"), Mitsui O.S.K. Lines, Ltd. ("MOL"), Kawasaki Kisen Kaisha, Ltd. ("'K' Line"), "K" Line America, Inc. ("'K' Line America"), EUKOR Vehicle Carriers Inc. ("EUKOR"), Wallenius Wilhelmsen Logistics AS ("WWL"), Wilh. Wilhelmsen Holding ASA ("WW Holding"), Wilh. Wilhelmsen ASA ("WW ASA"), Wallenius Wilhelmsen Logistics Americas LLC ("WWL America"), Wallenius Lines AB ("Wallenius"), Compania Sud Americana De Vapores S.A. ("CSAV"), Toyofuji Shipping Co., Ltd. ("Toyofuji") and Nissan Motor Car Carrier Co., Ltd. ("Nissan") (collectively the "Defendants") comprise the largest providers of vehicle transport services by sea ("Vehicle Carrier Services") in the world, including to and from the United States.

2.      Faced with excess capacity, Defendants (together with their co-conspirators) agreed, combined, and conspired to artificially fix, stabilize, or maintain prices of, and allocate the market for, Vehicle Carrier Services. This agreement, combination, and conspiracy unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.      The Vehicle Carrier Services market has the structure and characteristics which renders it susceptible to collusion: it is highly concentrated, there are significant barriers to entry, demand is relatively inelastic, services are highly homogenous, and Defendants had ample opportunities to (and in fact did) meet and conspire.

4.      Moreover, competition authorities in the United States, Canada, Japan, and the European Union have been actively investigating what has been deemed "the possibility of anticompetitive practices involving the ocean shipping of cars, truck, construction equipment and other products." As confirmed by one defendant, "such investigation seeks to inquire

2

into the existence of antitrust law violations related to cooperation agreements on prices and allocation of clients between car carriers."

5.      Defendants' agreement, combination, and conspiracy caused Plaintiff and others who directly purchased Vehicle Carrier Services from Defendants to pay artificially inflated prices. Thus, Plaintiff is bringing this lawsuit on behalf of itself and all other persons or entities who purchased Vehicle Carrier Services directly from one or more of the Defendants between January 1, 2008 and the time when the effects of Defendants' anticompetitive conduct have ceased (the "Class Period") to recover for those injuries sustained as a result of Defendants' unlawful conduct.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action against Defendants under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and the other members of the Class (as defined below) have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.      The Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and pursuant to 28 U.S.C. §§ 1331 and 1337.

8.      This Court has personal jurisdiction over each Defendant, because each Defendant: a) transacted business in the United States, including in this District; b) collected fees for Vehicle Carrier Services from persons or entities located throughout the United States, including in this District; c) had substantial aggregate contacts with the United States, including in this District; and/or d) committed overt acts in furtherance of their illegal scheme and conspiracy which were directed at the United States, and which had a direct, substantial, intentional, and reasonably foreseeable effect of causing injury to the business or property of

persons and entities residing in, located in, or transacting business throughout the United States, including in this District.

9.     The activities of Defendants and their Co-Conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

10.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and/or a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

## PARTIES

### Plaintiff

1.     Plaintiff Manaco International Forwarders, Inc. is a Florida corporation with its principal address at 2550 Eisenhower Boulevard, Suite 5, Ft. Lauderdale, Florida 33316. Manaco purchased Vehicle Carrier Services from one or more Defendants during the Class Period, and was injured thereby.

### Defendants

2.     Defendant NYK Line is a Japanese company with its principal place of business in Tokyo, Japan.  NYK Line, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

3.     Defendant NYK America is a wholly-owned subsidiary of NYK Line with its principal operations based in Secaucus, New Jersey.  NYK America provided, marketed and/or

4

sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

4.      Defendant MOL is a Japanese company with its principal place of business in Tokyo, Japan.   MOL, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

5.      Defendant "K" Line is a Japanese company with its principal place of business in Tokyo, Japan.   "K" Line, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

6.      Defendant "K" Line America is a wholly-owned subsidiary of "K" Line with its principal operations based in Richmond, Virginia. "K" Line America provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

7.      Defendant WW Holding is a Norwegian Company with its principal place of business in Baerum, Norway.   WW Holding, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

8.      Defendant WW ASA is a Norwegian company with its principal place of business in Oslo, Norway.   WW ASA, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

9.      Defendant EUKOR is a South Korean company with its principal place of business in Seoul, South Korea. EUKOR, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

10.     Defendant WWL is a Norwegian company with its principal place of business in Lysaker, Norway. WWL, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

11.     Defendant WWL America is a wholly-owned subsidiary of WWL with its principal operations based in Woodcliff Lake, New Jersey. WWL America provided, marketed and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

12.     Defendant Wallenius Lines AB is a Swedish Company with its principal place of business in Stockholm, Sweden. Wallenius Lines AB WWL, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

13.     Defendant CSAV is a Chilean company with its principal place of business in Valparaiso, Chile. CSAV, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

14.     Defendant Toyofuji is a Japanese company with its principal place of business in Tokai City, Japan. Toyofuji, directly and/or through its wholly-owned and controlled subsidiary,

6

provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

15.     Defendant Nissan is a Japanese company with its principal place of business in Tokyo, Japan.  Nissan, directly and/or through its wholly-owned and controlled subsidiary, provided, marketed, and/or sold Vehicle Carrier Services throughout the United States, including in this District, during the Class Period.

## AGENTS AND CO-CONSPIRATORS

16.     Various other individuals, firms, and corporations, not named as defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

17.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## INTERSTATE TRADE AND COMMERCE

18.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce, in that Vehicle Carrier Services were sold to, and purchased by, direct purchasers throughout the United States.

19.     Thus, during the Class Period (as defined below), Defendants and their co-conspirators issued and sold substantial quantities of Vehicle Carrier Services in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

20.     In sum, the conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

## FACTUAL ALLEGATIONS

### Vehicle Carrier Services: An Overview

21.     Within the maritime cargo industry, there are two categories of services: liner and tramp. Cargo liners are typically owned by larger companies and run on fixed schedules published by the shipping companies; tramp ships are typically owned by smaller companies or individuals and do not run on fixed schedules, but instead are chartered to haul individual loads.

22.     Various types of cargo liners are used to transport maritime cargo, which are generally grouped into five categories according to the type of cargo they carry: general cargo vessels (packaged items); tankers (liquids); dry-bulk carriers (loose, dry cargo like coal, grain, and ore); multi-purpose vessels (different classes of cargo at the same time); and reefer ships (perishable commodities needing temperature control).

23.     Vehicles are transported globally using specialized general cargo vessels called "Roll-on/Roll-off" ships (hereinafter, "RoRo" or "Vehicle Carriers"). As opposed to other types of cargo ships that typically use cranes to load and unload cargo (a.k.a., a "Lift-on, Lift-off" or "LoLo"), a RoRo typically has built-in ramps that enable Vehicles to be efficiently "rolled on" and "rolled off" the ship, hence the name.

24.     Vehicle Carriers were originally developed by the Japanese automobile manufacturers to transport their cars to the United States and Europe in a fast and efficient manner.  Nowadays, they are used for all types of wheeled cargo, including: cars, trucks, boats, buses, motor homes, tractor trailers, cranes, and other high and heavy equipment and machinery (collectively herein, "Vehicles").

25.     Compared to container shipping, Vehicle Carriers have considerably fewer routes and much more limited geographical coverage.  RoRo services to and from the United States are generally limited to major shipping ports.

26.     Vehicle Carriers are a readily defined submarket of the broader cargo market. Although some dual-purpose ships have been built, a Vehicle Carrier (*i.e.*, a RoRo) generally cannot transport containers and a container ship (*i.e.*, a LoLo) cannot transport vehicles unless they are in a container.  Moreover, unlike general cargo shipping, which is typically priced according to weight (*e.g.*, metric tonnes), RoRo cargo is typically priced by volume—*e.g.*, cubic feet ("CFT"), cubic meters ("CBM"), or lanes in meters ("LIM").

27.     Vehicle Carriers thus have no reasonable substitutes as there are no economically feasible alternatives to a RoRo: other cargo vessels either require goods to be shipped in containers (while certain vehicles can be containerized, it is not as efficient or economical) or those ships otherwise lack the ramps necessary for efficient loading and unloading of wheeled vehicles, and shipping vehicles through air transport would be too costly.

28.     Approximately 20% of shipped vehicles comprise imports into the United States—the single largest import market.  The Vehicle Carrier Services market in the United States represents nearly a billion dollars a year in revenue.

9

## Structure and Characteristics of the Vehicle Carrier Services Market

29.      By its nature, the Vehicle Carrier Services market lends itself to price-fixing by having characteristics that make collusion both easier and more attractive.

### A Highly Concentrated Industry

30.      The Vehicle Carrier Services market is highly concentrated.  As shown below, the seven largest companies by capacity represent well over two-thirds of the market:

| Operator | Number of Vessels | Capacity | % of Total |
|---|---|---|---|
| NYK Line | 110 | 624,346 | 17.8% |
| Mitsui O.S.K. Lines | 90 | 520,509 | 14.8% |
| "K" Line | 74 | 382,818 | 10.9% |
| EUKOR | 73 | 461,201 | 13.1% |
| Wallenius Wilhelmsen Line | 56 | 377,363 | 10.7% |
| CSAV | 12 | 58,933 | 1.7% |
| Nissan Motor Car Co. | 12 | 57,710 | 1.6% |
| TOYOFUJI | 6 | 34,560 | 1.0% |
| Others | 66 | 993,116 | 28.4% |
| Total | 639 | 3,510,556 | 100% |

Source: Hesnes Shipping AS, *The Car Carrier Market 2011*

31.      Moreover, Defendants comprise the five largest companies (as well as eight of the top fourteen), by capacity.  Altogether, as of 2011, Defendants comprised 71.6% of the Vehicle Carrier Services market, based on capacity:

10



Source: Hesnes Shipping AS, *The Car Carrier Market 2011*

## Commodity-Like Services

32.     Vehicle Carrier Services are homogeneous, commodity-like services.  Purchasers of Vehicle Carrier Services choose providers almost exclusively based on price, since the qualitative differences amongst providers are negligible.  Thus, providers of Vehicle Carrier Servicers are essentially interchangeable from the purchasers' perspective.

33.     The homogenous and interchangeable nature of Vehicle Carrier Services makes it easier to create and maintain an unlawful cartel since coordinating prices, as well as policing those collusively set prices, is less difficult than if Defendants' had distinctive services that could be differentiated based upon features other than price.

## Barriers to Entry

34.     There are substantial barriers to entry into the Vehicle Carrier Services market.  A new entrant into the industry would encounter significant hurdles, including multi-million dollar start-up costs associated with acquiring ships and equipment, distribution infrastructure, a skilled labor and sales force, and significant variable costs associated with raw materials, and energy.

35.     In addition, Vehicle Carrier Services are generally conducted on fixed schedules requiring an established system of routes with participants that have long-term relationships.  As a result, switching costs for shippers are high, thus creating an additional barrier to entry.

36.     In fact one Defendant proclaimed in an annual report: "[W]e have forged strong bonds of trust with our customers….[i]mportantly these relationships of trust inevitably make the car carrier business an extremely difficult one for new entrants."  Mitsui O.S.K. Lines Annual Report 2012, at pg.27.

37.     Defendants have increased the average size of the Ro/Ro ships in their fleets, making them less sensitive to fuel prices and creating other economies of scale.  Moreover, Defendants own other transportation-related businesses, thus providing them with economies of scope by, for example, allowing them to offer dedicated port terminals and inland vehicle transportation services.

### Demand Inelasticity

38.     Demand for Vehicle Carrier Services is highly inelastic as there are no close substitutes.  With the limited exception of certain dual-purpose ships, ships are generally suited for only one type of cargo—*e.g.*, bulk dry goods, liquids, standardized containers, or vehicles.  A Ro/Ro is built specifically to transport the large, irregular shapes of wheeled vehicles, and to enable those vehicles to be quickly and efficiently loaded and unloaded from the vessel.

39.     Therefore, a price increase in Vehicle Carrier Services does not induce purchasers into using other types of cargo vessels/services.  By allowing producers to raise prices without triggering customer substitution and lost sales revenue, inelastic demand facilitates collusion.

### Excess Capacity

40.     In recent years, the Vehicle Carrier Services market has experienced a supply glut, as evidenced by low Vehicle Carrier fleet utilization rates.

41.     As demonstrated by the chart below, the Vehicle Carrier Services had experienced

years of nearly-full utilization rates before taking a dramatic plunge in 2009:



Source: RS Platou, *ThePlatou Report,* 2005 - 2012

42.     Excess capacity, such as that in the Vehicle Carrier Services market, encourages

and facilitates collusion.  Moreover, the fact that prices increased and/or stabilized during the

Class Period despite this supply glut is indicative of price collusion within the market.

### Opportunity for Conspiratorial Communications

43.     Defendants are members of several trade associations that provide opportunities

to meet under the auspices of legitimate business.

44.     For example, Defendants NYK Line and "K" Line are also members of the

Transpacific Stabilization Agreement ("TSA").  The TSA specifically states on its website that

"TSA carriers discuss trade conditions and agree on the need for common, recommended pricing

and service goals" and that it provides a forum to "Meet, exchange market information, and