jointly conduct market research…and…develop voluntary, non-binding guidelines for rates and charges." (*See* "About TSA" at http://www.tsacarriers.org/about.html.)

45. Defendants CSAV (through its subsidiary CSAV Group North America), NYK America, "K" Line America, MOL (through its subsidiary, MOL (America), Inc.), and WWL America are all members of the United States Maritime Alliance, Ltd. ("USMX").

46. Defendants "K" Line, MOL, NYK America, and WWL America are all members of the New York Shipping Association, Inc.

47. Defendants "K" Line, MOL (through its subsidiary, MOL (America) Inc., NYK Line, and WWL are all members of the Pacific Maritime Association.

48. Defendants CSAV, "K" Line, MOL, NYK Line, and WWL are all members of the World Shipping Council.

49. Defendants CSAV, "K" Line, MOL, and NYK Line were all members of the European Liner Affair's Association, which was later absorbed by the World Shipping Council.

50. These associations—and the meetings, trade shows, and other industry events which stem therefrom—provided Defendants with ample opportunities to meet and conspire, as well as to perform affirmative acts in furtherance of the conspiracy. In fact, as discussed below, some of the Defendants have previously used such opportunities to fix prices in other cargo-related markets.

51. Defendants often enter into "vessel sharing" agreements whereby they reserve space on each other's ships. While ostensibly entered into to optimize utilization capacity and increase efficiency, such agreements also provide additional opportunities for Defendants to discuss Vehicle Carrier Service prices, price fixing, and customer allocation conspiracies.

### Defendants Have A History of Anticompetitive Collusion

52. Several of the Defendants have recently been fined and/or pled guilty to price fixing in other shipping-related markets.

53. Defendants "K" Line, MOL, and NYK Line have recently been fined by various competition authorities—including but not limited to those in the United States, Japan, and the European Union—for anticompetitive conduct involving freight fees that spanned several continents.

54. On March 19, 2009, the Japan Fair Trade Commission ("JFTC") ordered "K" Line Logistics, Ltd. (a subsidiary of "K" Lines"), MOL Logistics (Japan) Co., Ltd. (a subsidiary of MOL), Yusen Air & Sea Services Co., Ltd. (a subsidiary of NYK Line) and several other companies to pay $94.7 million in fines for violating the Japanese Antimonopoly Act.

55. Those violations resulted from a five-year-long conspiracy to, among other things, fix the prices for fuel surcharges, security charges, and explosive inspection charges for international air freight forwarding. Notably, Defendants negotiated these agreements at meetings of the Japan Aircargo Forwarders Association.

56. On September 30, 2011, MOL Logistics (Japan) Co., Ltd. (a subsidiary of MOL), pled guilty to a Criminal Information in the United States District Court for the District of Columbia whereby it was charged with violating the Sherman Act. According to the Criminal Information, MOL Logistics (Japan) Co., Ltd., together with it co-conspirators, agreed on one or more components of the freight forwarding service fees to be charged on air cargo shipments from Japan to the United States, charged customers in accordance with those agreements, and actively enforced/monitored the conspirators' adherence to that agreement.

57. On March 28, 2012, Yusen Shenda Air & Sea Service (Shanghai) Ltd. (a subsidiary of NYK Line) was fined by the European Commission (the "EC") for participating in

a cartel in violation of the European Union antitrust rules. According to the EC, "the cartelists established and coordinated four different surcharges and charging mechanisms, which are component elements of the final price billed to customers for these services." NYK Line's subsidiary participated in the so-called "Currency Adjustment Factor cartel." The fourteen companies involved were collectively fined $219 million.

58. On March 8, 2013, the United States Department of Justice ("DOJ") announced that "K" Line Logistics, Ltd. (a subsidiary of "K" Line") and Yusen Logistics Co., Ltd. (a subsidiary of NYK Line) agreed to pay $3.5 million and 15.3 million, respectively, for conspiring to fix prices for certain freight forwarding fees for cargo shipped from the United States to Japan and for actually charging customers those artificially-inflated fees.

### Current Government Investigations

59. In September 2012, antitrust authorities in Japan, the European Union, Canada, and the United States launched a coordinated international investigation into potential price fixing of Vehicle Carrier Services.

60. According to the DOJ, it is "coordinating with the European Commission, the Japanese Fair Trade Commission and other international competition authorities" and is investigating anticompetitive conduct involving the ocean shipping of cars, trucks, construction equipment and other vehicles.

61. Defendants CSAV, "K" Line, WW ASA (including its subsidiaries WWL and EUKOR), and MOL have publicly acknowledged that they are being investigated. According to WW ASA and CSAV, the investigation involves both price cooperation and customer allocation amongst the carriers.

62. Other news organizations have reported that Nissan and ToyoFuji were also being investigated for the same unlawful conduct.

## EFFECTS OF THE CONSPIRACY

63.     As a result of their unlawful contract, combination, and conspiracy, Defendants succeeded in restricting output and fixing, raising, maintaining, or stabilizing prices for Vehicle Carrier Services charged throughout the United States.

64.     Plaintiff and the other Class members have been injured in their business and property because they have paid more for Vehicle Carrier Services than they would have paid in a competitive market. Such injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

65.     Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

    (a)    Competition in the market for Vehicle Carrier Services has been restrained;

    (b)    Prices paid by Plaintiff and the members of the Class for Vehicle Carrier Services were fixed, stabilized, and/or maintained at supra-competitive levels throughout the United States;

    (c)    Customers and markets for Vehicle Carrier Services were allocated among Defendants and their co-conspirators;

    (d)    Plaintiff and the other members of the Class paid more for Vehicle Carrier Services than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive activities;

    (e)    Price competition regarding the sale of Vehicle Carrier Services was restrained, suppressed, and/or eliminated throughout the United States, thus raising the prices of Vehicle Carrier Services above what they would have been absent Defendants' actions;

    (f)    Direct purchasers of Vehicle Carrier Services have been deprived of the benefits of free and open competition; and

    (g)    As a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

66.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 6, 2012, when the global investigation was first publicly reported.

67.    Prior to September 6, 2012, a reasonable person under the circumstances would have believed the Vehicle Carrier Services to be a competitive industry and, thus, would not have been alerted to begin to investigate the legitimacy of Defendants' prices for Vehicle Carrier Services before that time.

68.    Price-fixing conspiracies are, by their very nature, inherently self-concealing. If a conspiracy is to be successful at fixing prices, the participants must ensure that customers do not discovery the existence of the conspiracy.

69.    Because Defendants' agreements, understandings, and conspiracies were kept secret until September 6, 2012, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Vehicle Carrier Services during the Class Period.

70.    Defendants' acts in furtherance of the conspiracy were concealed and carried out in a manner specifically designed to avoid detection.

71. Accordingly, a reasonable person under the circumstances would not have been alerted to Defendants' conspiracy before September 6, 2012.

72. Because of the deceptive practices and techniques employed by Defendants and their coconspirators to avoid detection, Plaintiff and members of the Class could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence.

73. Plaintiff and members of the Class had no knowledge of the alleged conspiracy or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed until September 6, 2012, when reports of the investigations into anti-competitive conduct concerning Vehicle Carrier Services were first publicly disseminated.

74. None of the facts or information available to Plaintiff and members of the Class, if investigated with reasonable diligence, would have led to the discovery of the conspiracy alleged herein prior to September 6, 2012.

75. Moreover, Defendants affirmatively concealed (and continue to try and conceal) their conspiracy by falsely claiming that the Vehicle Carrier Services market was competitive and creating the illusion that prices were rising as a result of increased demand and tight supply. For example, Defendants stated:

  (a) "The shipping business is very competitive and is noted for its sensitivity to changes in economic activity." CSAV Annual Report 2010, at pg. 15.

  (b) "CSAV works in a very competitive market, in which variations in global economic growth directly affect the demand for cargo transport." *Id.* at pg. 35.

  (c) "The results of the car-carrying services were severely affected by the fall in global demand seen in 2011…[a]dded to the weak global demand for car carriers

19

and the consequent under-utilization of ships was a sharp rise in oil prices." CSAV Annual Report 2011, at pg. 22.

(d) "Global automobile marine transport volume was robust through the middle of 2008, resulting in a severe shortage of vessels in the marine transport market, a market in which prices are based on the relationship between supply and demand. As a result, shipping rates were on the increase." NYK Annual Report 2009, at pg. 8.

(e) "In addition to Japanese marine transport operators, the NYK Group competes with international shipping companies operating throughout the globe, and the competitive situation is growing more intense." NYK Annual Report 2012, at pg. 102.

(f) "The 'K Line Group promises to comply with applicable laws, ordinances, rules and spirit of the international community and conduct its corporate activities through fair, transparent and free competition." "K" Line Annual Report 2009, at pg. 1.

(g) "The 'K' Line Group is doing business in all international markets, and is involved in competition with many shipping companies at home and abroad." "K" Line Annual Report 2008, at g. 55.

(h) "Through its capital intensity and cyclical nature, the shipping segment has historically represented higher volatility and financial risk than maritime services. The car/ro-ro shipping has during the recent history also represented the single largest investment area and exposure for the group and its shareholders....Demand for transportation of cars and other cargo has improved

20

significantly, primarily during the second half of the year, and combined with better mix of cargo types this has positively affected the profitability of the fleet." Wil. Wilhelmsen ASA Annual Report 2010, at pg. 20-21.

(i) "Demand for ocean transportation of ro-ro cargo to Oceania remained at low levels through the year, while car volumes rose in the latter half of the year. Trades involving emerging markets such as China, South America, India and Africa offered relatively healthy volumes through most of the year, although fierce competition put significant pressure on rates." Wil. Wilhelmsen ASA Annual Report 2009, at pg. 10.

76. Thus, Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning Vehicle Carrier Services, which they affirmatively concealed.

77. By reason of the foregoing, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and members of the Class have alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

78. Plaintiff brings this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States that purchased Vehicle Carrier Services directly from any Defendant (or any current or former subsidiary or affiliate thereof) or any of their co-conspirators during the Class Period.

79. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.

80. Plaintiff believes that there are thousands of Class members located throughout the entire United States, the exact number, location, and identities of which are known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

81. There are numerous questions of law and fact common to the Class, including:

   (a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Vehicle Carrier Services sold in the United States;

   (b) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers or markets for Vehicle Carrier Services sold in the United States;

   (c) The identity of the participants of the alleged conspiracy;

   (d) The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance thereof;

   (e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

   (f) Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the other members of the Class;

   (g) The effect of the conspiracy on the prices of Vehicle Carrier Services in the United States during the Class Period; and

   (h) The appropriate class-wide measure of damages.

82. These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

83. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws in that they paid artificially inflated prices for Vehicle Carrier Services purchased from Defendants or their co-conspirators. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

84. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

85. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86. Adjudicating the claims of the Class members as a class action is superior to any other available methods because it allows for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and this class action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

87. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

88. Beginning at least as early as June 3, 2011, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, have engaged in a continuing agreement, understanding, and conspiracy to unreasonably restrain trade in the Vehicle Carrier Services market in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

89. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, and/or maintain at artificially supra-competitive prices for Vehicle Carrier Services, and to allocate customers for Vehicle Carrier Services in the United States.

90. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Vehicle Carrier Services.

91. As a direct and proximate result of Defendants' unlawful conduct, competition in the discount brokerage services market was successfully restrained, and Plaintiff and Class members were injured by having paid more for Vehicle Carrier Services than they would have paid absent Defendants' unlawful conduct. Such injuries are of the type the antitrust laws were designed to prevent and flow directly from Defendants' unlawful conduct.

92. Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a) That the Court certify this action as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b) That the Court declare Defendants' contract, combination, and conspiracy to have violated Section 1 of the Sherman Act, which violations injured Plaintiff and the Class members in their business and property;

c) That Plaintiff and the Class members recover damages, as provided under the federal antitrust laws, and that a joint and several judgment in their favor be entered against Defendants in an amount to be trebled in accordance with such laws;

d) That Plaintiff and the Class members recover their costs of the suit, including reasonable attorneys' fees, as provided by law;

e) That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and their respective officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the conspiracy alleged in this Complaint; and

f) That the Court direct further relief as it may deem just and proper.

Dated: July 26, 2013

*[signature]*
J. Douglas Richards

Sharon K. Robertson
COHEN MILSTEIN SELLERS &
 TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
drichards@cohenmilstein.com
srobertson@cohenmilstein.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS &
 TOLL, PLLC
2925 PGA Boulevard
Suite 204
Palm Beach Gardens, FL 33410
Telephone: (561) 833-6575
jdominguez@cohenmilstein.com

Kit A. Pierson
Laura Alexander
COHEN MILSTEIN SELLERS &
 TOLL, PLLC
1100 New York Ave NW
Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
lalexander@cohenmilstein.com

Solomon B. Cera
C. Andrew Dirksen
Thomas C. Bright
GOLD BENNETT CERA
 & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com

Gregory P. Hansel
Randall B. Weill
Michael Kaplan

26